**Michaela A. GUDENKAUF, Plaintiff,**

v.

**STAUFFER COMMUNICATIONS, INC., a Delaware corporation, d/b/a Stauffer Magazine Group; and Christy Skinner, Defendants.**

No. 94–4228–SAC.

United States District Court,
D. Kansas.

Feb. 13, 1996.

Amy C. Bixler, Alan G. Warner, Topeka, KS, for Michaela A. Gudenkauf.

Michael W. Merriam, Goodell, Stratton, Edmonds & Palmer, Topeka, KS, for Stauffer Communications, Inc., a Delaware corporation, Christy Skinner, c/o Stauffer Communications, Inc. dba Stauffer Magazine Group.

## MEMORANDUM AND ORDER

CROW, District Judge.

This case comes before the court on the defendant Stauffer Communications, Inc.'s motion for summary judgment (Dk. 47). This is an employment discrimination action in which the plaintiff alleges the employer, Stauffer Communications, Inc. ("Stauffer"), terminated her employment on the basis of her sex, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e–2(a)(1), *et seq.;* on the basis of her pregnancy in violation of the Pregnancy Dis-

crimination Act of 1978 ("PDA"), 42 U.S.C. § 2000e(k), and on the basis of her disability in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.* The plaintiff further asserts that Stauffer denied her rights under the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601, *et seq.*[1]

## SUMMARY JUDGMENT STANDARDS

A court grants a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. The court is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will ... preclude summary judgment." *Id.* There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "[T]here are cases where the evidence is so weak that the case does not raise a genuine issue of fact." *Burnette v. Dow Chemical Co.,* 849 F.2d 1269, 1273 (10th Cir.1988).

The initial burden is with the movant to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.,* 968 F.2d 1022, 1024 (10th Cir.), *cert. denied,* 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). If this burden is met, the nonmovant must "come forward with specific facts showing that there is a genuine issue for trial as to elements essential to" the nonmovant's claim or position. *Martin v. Nannie and Newborns, Inc.,* 3 F.3d 1410, 1414 (10th Cir.1993) (citations omitted). The nonmovant's burden is more than a simple

---

1. In a recent order, the court dismissed the plaintiff's claim against both Stauffer and Christy

Skinner for intentional infliction of emotional distress.

showing of "some metaphysical doubt as to the material facts," *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356; it requires " 'present[ing] sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor.' " *Thomas v. International Business Machines,* 48 F.3d 478, 484 (10th Cir.1995) (quoting *Bacchus Industries, Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991)). The court views the evidence of record and draws all reasonable inferences in the light most favorable to the nonmovant. *Id.* A party relying on only conclusory allegations cannot defeat a properly supported motion for summary judgment. ·*White v. York Intern. Corp.,* 45 F.3d 357, 363 (10th Cir.1995).

More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). At the same time, a summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the evidence, or choose between competing inferences. *Windon Third Oil and Gas v. Federal Deposit Ins.,* 805 F.2d 342, 346 (10th Cir.1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

For purposes of this motion, the court considers the following facts to be uncontroverted.

The plaintiff Michaela Gudenkauf worked for Stauffer for more than a year before she was terminated on February 22, 1994. The defendant Christy Skinner supervised Gudenkauf's work. Gudenkauf describes her working relationship with Skinner as amicable and friendly from January of 1993 through early July of 1993. Gudenkauf remembers that Skinner had complemented her as energetic and a quick learner. Skinner, however, had talked with Gudenkauf about engaging in personal phone calls and personal conversations while at work. On her ninety-day review in May of 1993, Gudenkauf received a satisfactory performance rating and a pay raise. Skinner also wrote on the review that Gudenkauf was improving in the areas of personal conversations and personal phone calls.

Sometime in July of 1993, Gudenkauf told Stauffer that she was pregnant. According to Gudenkauf, Skinner's attitude towards her changed with the news of her pregnancy. Instead of being supportive, positive and complimentary, Skinner became negative, critical, and resentful. Approximately one week after learning of the pregnancy, Skinner counseled Gudenkauf for poor job performance, in particular tardiness and personal phone calls. Gudenkauf explained to Skinner that during her thirty-minute drive into work she had been experiencing morning sickness problems that forced her to stop. Gudenkauf opines that her work performance did not suffer during this period.

Gudenkauf avers that on August 19, 1993, she received a written warning for poor job performance and received certain guidelines for giving notice of anticipated late arrivals and for using leave without pay. Gudenkauf also was given restrictions on working at her desk, eating at her desk, taking break periods, and talking to co-workers. Gudenkauf told Skinner and Dianne Graves that some of the restrictions worked a hardship on her because of the pregnancy. Gudenkauf avers that other employees in the circulation department were not subject to the same restrictions and that she was the only pregnant employee in the circulation department.[2]

2. Stauffer objects that Gudenkauf's affidavit is not based on personal knowledge. Specifically, the. defendants insist she is not competent to testify "concerning the applicability or enforcement record of working restrictions at Stauffer." At this time, the court has no choice but to reject Stauffer's argument. First, Gudenkauf's averments concern only the circulation department in which she worked. Presumably, her desk and working area was in proximity to most of the other employees in her department. Second, it seems reasonable to think that she would have

had the opportunity to observe whether other employees ate at their desks, took breaks, received personal phone calls, and took lunch breaks at the same time every day. She also would have been in a similar position to witness management's enforcement of any such restrictions on other employees. Her observations are obviously matters within her own personal knowledge. Third, the plaintiff in her surreply brief says that all matters appearing in her affidavit are based on her personal knowledge as

On November 4, 1993, Skinner placed Gudenkauf on probation and criticized her efforts in meeting the different restrictions. Gudenkauf avers that she attempted to meet all restrictions to the extent that her pregnancy-related conditions allowed her. Gudenkauf further avers that she was falling behind on some of her principal assignments as Skinner had asked her to assist in other areas.

In December of 1993, Gudenkauf was taken off of probation and was given a pay raise. In her performance review, Skinner wrote that Gudenkauf had "gone through some major transitions which concerned [her] job performance and behavior while on the job." Gudenkauf reads "transitions" as a reference to her marriage and pregnancy.

Gudenkauf admits that because of her pregnancy she missed work during the months of January and February. On the morning of February 21, 1994, Gudenkauf phoned Skinner saying she was having contractions and was going to the doctor. That afternoon Skinner phoned Gudenkauf at her house to ask about her condition. Gudenkauf told Skinner that the contractions had stopped but that she could only work one-half days. Gudenkauf asked if she should work mornings or afternoons, and Skinner told her to work mornings. When Gudenkauf reported to work the next morning, Skinner met her at the door and escorted her to the business manager's office. Skinner handed Gudenkauf a memo that said she was terminated and that listed four items of "poor performance" as the reasons for termination.[3]

The first reason given for termination was that Gudenkauf had not done any filing for February. Gudenkauf responds that filing was no longer her responsibility as Skinner had assigned it to another employee in January.[4] The second reason was that Guden-

kauf had not processed a subscriptions request which had been sent with inadequate funds. Gudenkauf responds that she remembers seeing this request in November when it came in and never saw it again. In the termination memo, Skinner wrote that she found the unprocessed subscriptions in Gudenkauf's tickler file, but in her deposition, Skinner said she found the unprocessed subscriptions in Gudenkauf's top desk drawer. Gudenkauf avers that her tickler file was kept on top of her desk, that her top desk drawer was reserved for office supplies, and that she does not know how those unprocessed subscriptions came to be located there or who placed them there. The third and fourth reasons were that Gudenkauf was behind in her principal work assignments. Gudenkauf does not deny being behind but she attributes it to her pregnancy, to the increased holiday season workload, and to her assigned work on other periodicals.

During her pregnancy, Gudenkauf complained of morning sickness, stress, nausea, back pain, swelling and headaches. Gudenkauf believes that she was disabled during her last trimester. Gudenkauf's obstetrician, however, testified that his medical records showed that Gudenkauf did not experience any complications or conditions which were not normally expected with pregnancy and that her complaints did not indicate unusual symptoms or unusually severe conditions.[5] In fact, the obstetrician could find nothing in Ms. Gudenkauf's chart to indicate that her pregnancy was unusually difficult. Her obstetrician never noted any conditions during her pregnancy that would have impaired Gudenkauf's ability to work. Other than her pregnancy, the obstetrician's records do not show that Gudenkauf suffered from any physiological disorder or condition.

---

gained from "her observations, her experiences, and the information she was given by management personnel while employed by the Defendants." (Dk. 57 at 4).

**3.** Skinner testified in her deposition that her director Dianne Graves made the decision to terminate Gudenkauf. Graves in her deposition testified, however, she was not involved in the decision to terminate as she was out of town.

**4.** Skinner also testified in her deposition that this was not a reason for Gudenkauf's termination.

**5.** Gudenkauf's Advanced Registered Nurse Practitioner (ARNP) did not consider Gudenkauf's pregnancy as high risk or her complaints as significant enough to discuss with the obstetrician.

On February 21, 1994, just before her visit to the obstetrician's office, Gudenkauf stopped at Stauffer and obtained a medical leave form. Gudenkauf apparently completed the front of the form and placed the date of February 21, 1994, as the first day she was unable to work. The second page of the medical leave form states that Gudenkauf was "continuously totally disabled (unable to work) From 3–4–94 (Delivered) Thru 6 wk. postpartum." (Dk. 47 at Ex. 7). Gudenkauf's ARNP signed the second page of this leave form on February 21, 1994.

Gudenkauf's obstetrician testified that the medical records do not show that she requested or that he supplied her with any written authorization to take medical leave prior to delivery. Gudenkauf's ARNP avers that she signed the leave form so that Gudenkauf would receive maternity benefits after delivery and that she did not authorize and does not believe the leave form authorizes Gudenkauf to take full or part-time leave prior to delivery. The ARNP was not authorized to grant medical leave without first discussing with the patient's physician the medical conditions that necessitated leave.

Stauffer never received a certification of serious health condition from a health care provider concerning Gudenkauf and authorizing her to take leave prior to delivery.[6] Stauffer provided Gudenkauf with the standard post-delivery maternity benefits for six weeks even though she was terminated prior to delivery.

■ Summary judgments are "used sparingly in employment discrimination cases." *Hardin v. Hussmann Corp.*, 45 F.3d 262, 264 (8th Cir.1995). This is because discrimination claims often turn on the employer's intent, *McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 370–71 (7th Cir.1992), and courts ordinarily consider summary judgment inappropriate to settle an issue like intent, *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 530 (10th Cir.1994). Even so, summary judgment is not "per se

improper," *Washington v. Lake County, Ill.*, 969 F.2d 250, 253 (7th Cir.1992), and may be useful in weeding out claims and cases obviously lacking merit, *Summers v. State Farm Mut. Auto. Ins. Co.*, 864 F.2d 700, 709 (10th Cir.1988), *overruled on other grounds*, *McKennon v. Nashville Banner Pub. Co.*, — U.S. ——, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995). For example, when the plaintiff's evidence fails to create any reasonable doubts about the employer's expressed lawful motive for taking the adverse employment action, summary judgment is proper. *Cone*, 14 F.3d at 530.

### SEX AND PDA CLAIMS

■ Title VII prohibits, *inter alia*, an employer from discharging an employee because of the employee's sex. 42 U.S.C. § 2000e–2(a)(1). Congress in 1978 added the PDA to the definitional section of Title VII. It provides:

> The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work....

42 U.S.C. § 2000e(k). The PDA was added to " 'prevent the differential treatment of women in all aspects of employment based on the condition of pregnancy.' " *E.E.O.C. v. Ackerman, Hood & McQueen, Inc.*, 956 F.2d 944, 947 (10th Cir.) (quoting *Carney v. Martin Luther Home, Inc.*, 824 F.2d 643, 646 (8th Cir.1987) ("Pregnant women who are able to work must be permitted to work on the same conditions as other employees; and when they are not able to work for medical reasons, they must be accorded the same rights, leave privileges and other benefits, as other workers who are disabled from working.")), *cert. denied*, 506 U.S. 817, 113 S.Ct. 60, 121

---

**6.** The court sustains the defendants' objection to the affidavit of Winona "Sebe" Masquat and does not consider it. The magistrate judge denied the plaintiff's motion to amend her witness list to add Masquat as a witness. (Dk. 58). The plaintiff did not seek review of the magistrate judge's order.

L.Ed.2d 28 (1992). The apparent scope of the PDA is evidenced by 29 C.F.R. § 1604.10(b), which reads, in part:

■ Disabilities caused or contributed to by

pregnancy, childbirth, or related medical conditions, for all job-related purposes, shall be treated the same as disabilities caused or contributed to by other medical conditions, under any health or disability insurance or sick leave plan available in connection with employment. Written or unwritten employment policies and practices involving matters such as the commencement and duration of leave, the availability of extensions, the accrual of seniority and other benefits and privileges, reinstatement, and payment under any health or disability insurance or sick leave plan, formal or informal, shall be applied to disability due to pregnancy, childbirth or related medical conditions on the same terms and conditions as they are applied to other disabilities.

In short, the PDA was intended " 'to provide relief for working women and to end discrimination against pregnant workers.' " *E.E.O.C. v. Ackerman, Hood & McQueen, Inc.*, 956 F.2d at 947 (quoting *California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 285–86, 107 S.Ct. 683, 691–92, 93 L.Ed.2d 613 (1987)).

■ The parties tacitly agree this is a disparate treatment case. PDA claims are subject to the same disparate treatment analysis used under Title VII. *E.E.O.C. v. Ackerman, Hood & McQueen, Inc.*, 956 F.2d at

947; *Brinkman v. State, Dept. of Corrections*, 863 F.Supp. 1479, 1485 (D.Kan.1994). The evidence to prove a disparate treatment claim may be direct or circumstantial. *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir.1994). Absent direct evidence of discrimination, one type of circumstantial proof is the burden-shifting scheme established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and later refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).[7] Another type of circumstantial proof "consists of suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Troupe*, 20 F.3d at 736 (citations omitted).

■ In the motion, Stauffer does not argue that the plaintiff is unable to present a prima facie case of discrimination or otherwise come forth with evidence from which an inference of discriminatory intent can be drawn. Instead, Stauffer takes aim at the plaintiff's ability to prove that its stated reasons for discharging her are pretextual or to carry her ultimate burden of proof. The court finds that on the record as it now exists the plaintiff's evidence presents a genuine issue of material fact concerning Stauffer's discriminatory intent.

The court will highlight some of the evidence pertinent to the issue of discriminatory intent. Skinner's attitude towards the plain-

---

7. Under this scheme, the plaintiff must first establish a prima facie case of discrimination. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407, 415 (1993). If proved, a prima facie case gives rise to a presumption of discrimination and shifts the burden of production to the defendant to articulate a legitimate, nondiscriminatory reason for its treatment of the plaintiff. *St. Mary's*, 509 U.S. at 506–07, 113 S.Ct. at 2747–48, 125 L.Ed.2d at 416. If the defendant carries the burden of production, then the presumption of discrimination drops from the case. *St. Mary's*, 509 U.S. at 506–07, 113 S.Ct. at 2747–48, 125 L.Ed.2d at 416. The plaintiff retains the ultimate burden of persuading the factfinder of intentional discrimination. *Id.* To prevail, the plaintiff must directly prove the employer acted on a discriminatory

motive or indirectly prove the employer's reasons were a pretext for discrimination, that is, the stated reasons were false and discrimination was the real reason. *Martin v. Nannie and the Newborns, Inc.*, 3 F.3d 1410, 1417 (10th Cir.1993); *see St. Mary's*, 509 U.S. at 516, 113 S.Ct. at 2752, 125 L.Ed.2d at 422. "Although a prima facie case combined with disproof of the employer's explanation does not prove intentional discrimination as a matter of law, it may permit the factfinder to infer intentional discrimination, and thus preclude summary judgment for the employer." *Durham v. Xerox Corp.*, 18 F.3d 836, 840 (10th Cir.1994) (citations omitted), *cert. denied*, —— U.S. ——, 115 S.Ct. 80, 130 L.Ed.2d 33 (1994). On the other hand, summary judgment is appropriate when the plaintiff fails to present evidence of pretext. *Cone*, 14 F.3d at 529.

**472**

tiff turned critical and negative after learning that Gudenkauf was pregnant. During her first six months of employment Gudenkauf was never formally counseled for poor performance, and only a week or two after announcing her pregnancy Gudenkauf was first counseled. *E.E.O.C. v. Ackerman, Hood & McQueen, Inc.*, 956 F.2d at 949 (that plaintiff was first counseled for job performance only days after announcing her pregnancy is evidence of a discriminatory intent). Skinner imposed restrictions on Gudenkauf's conduct during work that apparently were not required of other employees in the circulation department. One or more of those restrictions arguably were directed at physical conditions related to Gudenkauf's pregnancy. On Gudenkauf's performance review completed in December of 1993, Skinner noted that Gudenkauf had gone through "some *major transitions* which concerned her job performance and behavior while on the job." The very next day after learning that Gudenkauf experienced contractions but did not deliver, Stauffer terminated her. Despite knowledge that because of her pregnancy Gudenkauf had missed more work during January and February of 1994 and had been having difficulty keeping up with work to the point that Skinner had assigned her filing responsibilities to others, Skinner apparently never warned Gudenkauf during either month that termination was likely unless her performance improved. Finally, the present state of the record suggests that some of the circumstances surrounding the termination appear suspicious, like who decided to terminate her, who decided on the reasons stated in the notice of the termination, and who decided on the manner in which to handle to the termination. The court denies Stauffer's motion for summary judgment on Gudenkauf's PDA claim.

**ADA CLAIM**

The plaintiff claims that Stauffer violated the ADA in not accommodating her requests for leave and in discharging her after she had requested an accommodation in her work schedule. The plaintiff alleges she was a qualified individual with a disability by reason of the medical complications she was experiencing as a result of her pregnancy. Stauffer argues that Gudenkauf is unable to prove she suffered from an impairment that substantially limited a major life activity.

The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To state a prima facie case of disability discrimination on an employment termination claim, the plaintiff must demonstrate: "(1) that [s]he is a disabled person within the meaning of the ADA; (2) that [s]he is qualified, that is, with or without reasonable accommodation (which [s]he must describe), [s]he is able to perform the essential functions of the job; and (3) that the employer terminated [her] ... because of [her] ... disability." *White v. York Intern. Corp.*, 45 F.3d 357, 360–61 (10th Cir.1995) (citations omitted).

"The term 'disability' means, with respect to an individual—(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). To decide whether someone is disabled as defined above, one must know the meaning of three other important terms, "physical or mental impairment," "substantially limits," and "major life activities." Because the ADA does not define any of these terms, we are guided by the definitions adopted by the Equal Employment Opportunity Commission ("EEOC") in regulations issued pursuant to 42 U.S.C. § 12116. *See Bolton v. Scrivner*, 36 F.3d 939, 942 (10th Cir.1994), *cert. denied*, ___ U.S. ___, 115 S.Ct. 1104, 130 L.Ed.2d 1071 (1995).

The ADA regulations adopt the definition of "physical or mental impairment" found in the Rehabilitation Act regulations, 34 C.F.R. § 104. *See* 29 C.F.R. Pt. 1630, Appendix to Part 1630—Interpretive Guidance on Title I of the Americans with Disabilities Act, § 1630.2(h) Physical or Mental Impairment; *Hamm v. Runyon*, 51 F.3d 721, 725 (7th Cir.1995) ("[T]he ADA borrows extensively

from the Rehabilitation Act and uses many of the same terms."). The term means "any physiological disorder or condition, ... affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory ..., cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or ... [a]ny mental or psychological disorder, ... and specific learning disabilities." 29 C.F.R. § 1630.2(h) (1995).

In determining whether an individual has a "physical or mental impairment," the EEOC's interpretative guidance on Title I of the ADA says "[i]t is important to distinguish between conditions that are impairments and physical, psychological, environmental, cultural and economic characteristics that are not impairments." 29 C.F.R. Pt. 1630, § 1630.2(h), at 401. It goes on to explain this statement:

> The definition of the term "impairment" does not include physical characteristics such as eye color, hair color, left-handedness, or height, weight or muscle tone that are within "normal" range and are not the result of a physiological disorder. The definition, likewise, does not include characteristic predisposition to illness or disease. **Other conditions, such as pregnancy, that are not the result of a physiological disorder are also not impairments.**

*Id.* (emphasis added).

■ The courts that have considered the above regulations and the EEOC's interpretative guidance have uniformly held that pregnancy, by itself, is not a disability. *See Villarreal v. J.E. Merit Constructors, Inc.,* 895 F.Supp. 149, 152 (S.D.Tex.1995); *Tsetseranos v. Tech Prototype, Inc.,* 893 F.Supp. 109, 119 (D.N.H.1995); *Byerly v. Herr Foods, Inc.,* No. A. 92–7382, 1993 WL 101196, 61 Empl.Prac.Dec. ¶ 42,226 (E.D.Pa. Apr. 6, 1993). In *Tsetseranos,* the court said:

> Based on these regulations, the court concludes that pregnancy and related medical conditions do not, absent unusual circumstances, constitute a "physical impairment" under the ADA. Accordingly, pregnancy and related medical conditions are not "disabilities" as that term is de-

fined by the ADA. The court finds this conclusion to be supported not only by the ADA's definition of disability and the EEOC's interpretative guidance on the ADA, but also by the fact that employment discrimination on the basis of pregnancy and related medical conditions is specifically covered by Title VII and the Pregnancy Discrimination Act.

893 F.Supp. at 119 (citation omitted); *see also Villarreal,* 895 F.Supp. at 152; *Byerly,* 1993 WL 101196, at *4. The implicit reasoning in these decisions is persuasive and sound. Pregnancy is a physiological condition, but it is not a disorder. Being the natural consequence of a properly functioning reproductive system, pregnancy cannot be called an impairment. *See Brennan v. National Telephone Directory Corp.,* 850 F.Supp. 331, 343 (E.D.Pa.1994) (pregnancy is not a handicap or disability under a Pennsylvania law apparently modelled after the ADA). All of the physiological conditions and changes related to a pregnancy also are not impairments unless they exceed normal ranges or are attributable to some disorder.

As authority for her position that pregnancy is an impairment, the plaintiff cites *Pacourek v. Inland Steel Co.,* 858 F.Supp. 1393 (N.D.Ill.1994), and *Chapsky v. Baxter V. Mueuller Div.,* No. 93–6524, 1995 WL 103299, 66 Empl.Prac.Dec. ¶ 43,573 (N.D.Ill. Mar. 9, 1995). In *Pacourek,* the plaintiff's alleged impairment was a condition of esphofical reflux which ostensibly prevented the plaintiff from becoming pregnant naturally. The defendant did not dispute that this would be an impairment with the reproductive system. 858 F.Supp. at 1404. In *Chapsky,* the court read *Pacourek* as holding "that reproduction is a major life activity, therefore, it must be considered a disability" and that "the reproductive system is a physical impairment which not only affects major life's activities but life is also substantially limited by reproduction." 1995 WL 103299, at *3. This court simply does not share *Chapsky's* broad reading of the *Pacourek* opinion. Whether pregnancy as the result of a normal functioning reproductive system is an impairment was not an issue discussed or decided in the *Pacourek* opinion. The court

in *Chapsky* neither cited nor discussed the EEOC's interpretative guidance concerning pregnancy as an impairment. The court in *Chapsky* rejected the *Byerly* decision as having cited no authority for its position, even though the court in *Byerly* had cited the EEOC's interpretative guidance. In short, this court is not persuaded by *Chapsky*, and, in particular, its conclusion that pregnancy as the natural consequence of a normal reproductive system is a disability.

 The medical evidence of record plainly establishes that Gudenkauf's pregnancy was not unusual or abnormal. The conditions she experienced with the pregnancy were not outside the normal range. Consequently, the plaintiff cannot prove she suffered from an impairment for purposes of the ADA. Stauffer is entitled to summary judgment on the plaintiff's ADA claim.

## FMLA CLAIM

The plaintiff claims that Stauffer violated her rights under the FMLA when it discharged her instead of giving her leave to work part-time from February 22, 1994, until her delivery on March 4, 1994. During that period, the plaintiff claims that complications with her pregnancy prevented her from working full-time.

 Congress enacted the FMLA in 1993 in response to demographic changes in the workforce that had negatively impacted the family's ability to care for children and ill family members. 29 U.S.C. § 2601(a). Balancing the family's needs against the demands of the workplace, the Congress designed the FMLA "to provide a security net for families by setting a minimum employment standard for unpaid leave that is required on the basis of medical necessity."

*Johnson v. Primerica*, No. 94 Civ. 4869, 1996 WL 34148 (S.D.N.Y. Jan. 30, 1996) (citations omitted).

Under the FMLA, an eligible employee [8] is entitled to twelve workweeks of leave over any period of twelve months because of 1) the birth or care of the employee's newborn child; 2) the placement of a child with the employee for foster care or adoption; 3) the care of an employee's child, spouse or parent having a serious health condition; and 4) the employee's serious health condition leaves the employee unable to perform the requirements of his job. 29 U.S.C. § 2612(a). When leave is required for the serious health condition of the employee or the employee's child, spouse or parent, the employee may take intermittent leave or a reduced leave schedule. 29 U.S.C. § 2612(b). Following a qualified leave period, an employee is entitled to reinstatement to the former position or an equivalent one with the same benefits and terms. 29 U.S.C. § 2614(a). The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a).

 Stauffer seeks summary judgment arguing that Gudenkauf's request for a reduced leave schedule prior to delivery does not qualify for FMLA protection [9] for two reasons. First, Gudenkauf did not have a serious health condition at the time she requested part-time work. Second, Gudenkauf did not and could not provide the necessary certification for a serious health condition. Gudenkauf concedes she was not entitled to leave under the FMLA prior to delivery unless she suffered from a "serious health condition" that kept her from performing her job duties.[10]

8. The FMLA covers employers engaged in commerce who employ fifty or more persons that work each day for at least twenty weeks in a calendar year and that work within seventy-five miles of the worksite. An employee is eligible after being employed for a minimum of twelve months and working a minimum of 1,250 hours during that previous twelve-month period.

9. In most prima facie cases of employment discrimination, the first element requires that the plaintiff be a member of the protected class. For purposes of a FMLA discrimination class, the

plaintiff is a member of the protected class when the employee is exercising or attempting to exercise his or her rights under FMLA. *See Oswalt v. Sara Lee Corp.*, 889 F.Supp. 253, 259 (N.D.Miss. 1995), aff'd, 74 F.3d 91 (5th Cir.1996); *McCown v. UOP, Inc.*, No. 94 C 2179, 1995 WL 519818, at *6 (N.D.Ill.1995).

10. *See* 29 C.F.R. § 825.112(c) (1995) (An expectant mother may take FMLA leave prior to the birth of her child, if it is required for prenatal care or because her condition makes her unable to work.)

■ The FMLA defines a "serious health condition" as:

> an illness, injury, impairment, or physical or mental condition that involves—(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider.

29 U.S.C. § 2611(11). This definition is ambiguous: particularly, as to what constitutes "continuing treatment by a health care provider." *Seidle v. Provident Mut. Life Ins. Co.*, 871 F.Supp. 238, 242 (E.D.Pa.1994). This warrants a look at legislative history and what Congress intended as possible serious health conditions. *Brannon v. Oshkosh B'Gosh, Inc.*, 897 F.Supp. 1028, 1035 (M.D.Tenn.1995). The Senate Report's list of possible "serious health conditions" includes: "ongoing pregnancy, miscarriages, complications or illness related to pregnancy, such as severe morning sickness, the need for prenatal care, childbirth and recovery from childbirth." S.Rep. No. 3, 103rd Cong., 1st Sess.1993, 1993 U.S.C.C.A.N. at 30–31.

■ To clear the "serious health condition" hurdle, Gudenkauf argues that she had a physical condition (pregnancy) for which she received continuing prenatal care and treatment from a health care provider. Our inquiry into the meaning of "serious health condition" does not end with that statutory definition or the legislative history. Congress directed the Secretary of Labor to "prescribe such regulations as are necessary to carry out" the FMLA. 29 U.S.C. § 2654. The regulation defining a "serious health condition" offers this: [11]

> (2) *Continuing treatment* by a health care provider. A serious health condition involving continuing treatment by a health

care provider includes any one or more of the following:

> (i) A period of *incapacity* (i.e. inability to work, attend school or perform other regular activities due to the serious health condition, treatment therefor, or recovery therefrom) of more than three consecutive days. . . .
>
> (ii) Any period of incapacity due to pregnancy, or for prenatal care.

29 C.F.R. §§ 825.114(a)(2)(ii); 825.800. This regulation is a reasonable interpretation of the FMLA scheme.[12]

Gudenkauf's request for a reduced leave schedule on February 21, 1994, is not protected by the FMLA, unless there is evidence from which a reasonable jury could find that her pregnancy and related conditions kept her from performing the functions of her job. *See Brannon v. Oshkosh B'Gosh, Inc.*, 897 F.Supp. at 1037; *Sakellarion v. Judge & Dolph, Ltd.*, 893 F.Supp. 800, 807 (N.D.Ill.1995). On this critical point, Gudenkauf offers only her opinion.

In her deposition, Gudenkauf testifies to back pain, nausea, headaches and swelling during her pregnancy. She also testified that on February 21, her "ARNP asked to put" her "on full leave" but the plaintiff "declined" wanting to "try half days first." (Gudenkauf Depo. at 36). In her affidavit, Gudenkauf avers that "due to my declining health and growing discomfort from my pregnancy I was becoming unable to work as effectively as I did in my pre- and early-pregnancy states." (Dk. 51, Ex. A).

The plaintiff's deposition testimony and affidavit are insufficient evidence to base a finding that the plaintiff's pregnancy and related conditions kept her from performing the functions of her job for more than one-

---

**11.** "Administrative regulations promulgated in response to express delegations of authority, like the one at issue here, 'are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.'" *Manuel v. Westlake Polymers Corp.*, 66 F.3d 758, 763 (5th Cir.1995) (Held that notice regulations for FMLA were a reasonable interpretation of the FMLA scheme) (quoting *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984)).

**12.** The "incapacity" requirement in 29 C.F.R. § 825.114(a)(2) is consistent with the requirement in 29 U.S.C. § 2612(a)(1)(D) that the health condition be so serious that the employee is unable to perform the functions of his position. Though Congress listed "ongoing pregnancy" as an example of a serious health condition, pregnancy entitles the employee to FMLA leave only if prenatal care is needed or her condition makes her unable to work. 29 U.S.C. § 2612(a)(1)(D); 29 C.F.R. §§ 825.112(c), 825.114(a)(2).

half day. *See Brannon,* 897 F.Supp. at 1037 ("plaintiff's own testimony that she was 'too sick to work' is also insufficient to prove that her absence was necessary"); *Sakellarion,* 893 F.Supp. at 807 ("plaintiff's assertion that her adult daughter needed to stay in bed, without more, is not sufficient evidence from which a jury could infer that the daughter was incapable of self-care"). First, neither Gudenkauf's obstetrician nor her ARNP corroborate her testimony that she was directed or authorized by them to take leave for her pregnancy-related conditions on February 21, 1994, and thereafter. Second, her obstetrician testified that the medical records do not show that Gudenkauf requested or that he supplied her with any written authorization to take leave prior to her delivery. Third, the obstetrician observed from Gudenkauf's medical charts that her pregnancy was normal and that her complaints about the symptoms and conditions commonly associated with pregnancy were not unusual or severe. Fourth, her obstetrician never noted any conditions during Gudenkauf's pregnancy that would have impaired her ability to work. Fifth, the ARNP avers that she signed a leave form so that Gudenkauf would receive maternity benefits after delivery and that she did not authorize and does not believe the leave form authorizes Gudenkauf to take either full or part-time leave prior to delivery. Sixth, the ARNP never considered Gudenkauf's complaints as significant enough to discuss with her obstetrician for purposes of authorizing leave from work. In short, the plaintiff has not presented any medical evidence showing that on February 21, 1994, her pregnancy and pregnancy-related conditions kept her from performing the functions of her job for more than one-half day. The medical evidence of record is to the contrary.

Because the plaintiff's assertions of inability to work are insufficient and contradicted by medical evidence, the plaintiff is unable to prove as a matter of law that her request for leave was protected by the FMLA. Consequently, Stauffer's failure to grant the plaintiff's leave request and subsequent termination of her do not violate the FMLA.

IT IS THEREFORE ORDERED that Stauffer's motion for summary judgment (Dk. 47) is denied as to the plaintiff's claim under the Pregnancy Discrimination Act of 1978, but Stauffer's motion is granted as to the plaintiff's claims under the Americans with Disabilities Act of 1990 and the Family and Medical Leave Act of 1993.